# United States Court of Appeals

## For the First Circuit

Nos. 08-2160
     08-2161

GEORGE P. BUKURAS,

Plaintiff-Appellant, Cross-Appellee,

v.

MUELLER GROUP, LLC,

Defendant-Appellee, Cross-Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Ripple,* Circuit Judges.

Jeremiah P. Sullivan, Jr., with whom Sullivan and McDermott,
was on brief for appellant.
Christopher Cole, with whom Karyl R. Martin and Sheehan
Phinney Bass + Green, P.A., were on brief for appellee.

January 20, 2010

---

* Of the Seventh Circuit, sitting by designation.

**TORRUELLA**, **Circuit Judge**.  This is a contract dispute between the Mueller Group, LLC ("Mueller" or the "Company") and its former general counsel, George P. Bukuras, over the interpretation of the severance and general release provisions of Bukuras's employment agreement.  The district court granted summary judgment against Bukuras on his claim that the Company breached the terms of his employment when it failed to include in the calculation of his severance compensation a $1 million transaction bonus he received in connection with a sale of the Company, which the district found unsupported by the plain terms of the agreement.  See Bukuras v. Mueller Group, LLC, No. 06-11790, 2008 U.S. Dist. LEXIS 64517, at *17 (D. Mass. Aug. 14, 2008).  The district court also granted summary judgment against Mueller on its counterclaim alleging that Bukuras's suit violated a general release of claims executed by Bukuras at the time of his termination, finding that Bukuras's claim was outside the scope of the release and that, in any event, the release did not support an independent claim for breach which would entitle Mueller to recover its litigation expenses incurred in defending against Bukuras's claims.  Id. at *23-25.  On appeal, both parties challenge these determinations.  We affirm in all respects.

# I. Background

## A. Facts

In August 2000, Mueller chief executive officer Dale Smith offered Bukuras a position as the Company's general counsel. Smith's offer letter provided for a base salary of $180,000, an annual bonus equal to four percent of the Company's shared bonus pool, and other benefits, including severance benefits as outlined in Mueller's draft executive severance pay policy. A copy of that policy was attached to the offer letter. Bukuras accepted, and began work as Mueller's general counsel in October 2000.

Two years later, in the fall of 2002, Mueller's owners, DLJ Merchant Banking Partners ("DLJ"), contemplated selling the Company through a private auction. In connection with this effort, Bukuras informed Smith in January 2003 that, in his opinion, the Company was legally obligated to pay him upon termination the benefits described in the severance policy attached to Smith's August 2000 offer of employment, and that those payments were among the obligations that needed to be disclosed to prospective bidders. Smith, who had never submitted the draft policy to Mueller's board of directors for approval, disagreed with Bukuras and the conflict became heated. Smith invited Bukuras to resign.

Looking to resolve the matter, Bukuras sent a memorandum to Mueller's board of directors in which he summarized his version of the disagreement with Smith and informed the board of his

preference to remain with the Company through the proposed sale, provided he could execute a new employment agreement so that everyone would be on the same page regarding his severance benefits. The board agreed and, after negotiations in which both Bukuras and the Company were represented by counsel, the parties executed a new employment agreement, which became effective in early February 2003.

Under the terms of the 2003 employment agreement (the "Agreement"), Mueller undertook, among other things, to pay Bukuras an increased annual salary of at least $200,000 and, under the heading "Bonus," "an annual bonus, payable at the conclusion of each fiscal year, equivalent to not less than 5% of the bonus pool applicable to compensate executive management of the company." Agreement, § 4 [hereinafter, the "Bonus Provision"]. In addition, the Agreement provided that if the Company terminated Bukuras for any reason other than cause:

> [T]he employee shall be entitled to severance compensation in an amount equal to the sum of (A) eighteen (18) months Salary (at the rate then in effect), plus (B) <u>one hundred fifty (150%) percent of the bonus paid or payable to the Employee for the fiscal year immediately preceding the fiscal year in which termination occurs</u>.

Id. § 4(d) (emphasis added)[hereinafter, the "Severance Provision"]. Receipt of this severance payment was expressly conditioned on Bukuras's execution of a general release of claims against the Company, and a model release was appended to the

-4-

Agreement. Further, in exchange for the severance benefits described in the Agreement, Bukuras agreed to forgo certain "Transaction Benefits" that the board was then considering awarding to certain employees "in connection with a change of control transaction expected to be consummated during [fiscal year ("FY") 2003]." Id. § 4(c).[1]

At the time he entered into the Agreement, Bukuras had received annual bonuses for each of his two years at Mueller. In both years, the bonuses were conditioned on the Company meeting certain financial targets, measured in terms of earnings before interest, taxes, depreciation, and amortization (or, "EBITA"). Based on those targets, the Company allocated a pool of money for division among eligible senior executives according to the terms of their employment. For example, for FY 2001 the Company set an earnings target of $180 million EBITA and a bonus pool of $4,797,000. When the Company hit its mark, Bukuras received a $192,000 bonus, which was equal to four percent of the pool, per the terms outlined in Smith's initial offer letter. For FY 2002, Bukuras received a bonus of $240,000, calculated according to the same methodology. Following the execution of the revised Agreement, under which Bukuras was entitled to a larger (five percent) share of the annual bonus pool, he received a $245,000

_____

[1] At all times relevant to this dispute, Mueller's fiscal year ended on September 30.

bonus for FY 2003 and a $210,000 bonus for FY 2004, with both bonuses calculated according to the same EBITA-based formula used in previous years. In every year of his employment, Bukuras received his annual bonus following the conclusion of the fiscal year, a delay which was necessary to allow the Company's auditors to review its earnings.

The auction process contemplated by DLJ was unsuccessful and did not result in the sale of the Company in 2003. As a result, Smith and Bukuras's strained relationship continued. However, in late 2004, DLJ began the process for another private auction in a second attempt to sell the Company. In April 2005, anticipating the sale, Mueller's board passed several resolutions relating to the compensation of key executives, including a resolution setting the EBITA target and bonus pool for FY 2005 according to the same methodology used in previous years.

Walter Industries ("Walter") emerged as the successful bidder at auction and, on June 17, 2005, Mueller and Walter signed a definitive merger agreement, which was conditioned on, among other things, Hart-Scott-Rodino antitrust review by the Federal Trade Commission ("FTC"), see 15 U.S.C. § 18a, a process expected to take several months. Closing was set to occur within two days of the satisfaction of all conditions set forth in the merger agreement. However, the merger agreement provided that if the conditions were not satisfied within six months of the June

signing, the agreement would terminate and Walter's obligation to purchase the Company would expire.

Also on June 17, 2005, the board passed a resolution setting aside a pool of up to $10 million for the payment of a one-time "transaction bonus." At closing, this pool would be allocated to 17 employees -- including Bukuras, certain members of the management team, and legal personnel involved in bringing the transaction to a close.[2] The transaction bonus was intended to provide an incentive to the employees, some of whom understood they would likely be terminated following the sale, to remain with the Company until the merger was complete. The transaction bonus was also meant to reward those employees for their efforts in bringing the transaction to a successful close. Bukuras expected to receive a $1 million transaction bonus, equal to ten percent of the pool, if and when the deal went through.

Following the execution of the merger agreement, on advice of outside counsel, Bukuras and other employees agreed to submit certain anticipated change of control payments, including the transaction bonus and any severance compensation, for shareholder approval in order to avoid a tax penalty. As general counsel (and also, since June 2004, chief compliance officer),

---

[2] Participation in the transaction bonus pool was not coextensive with participation in "the bonus pool applicable to compensate executive management of the company" referenced in the Bonus Provision of Bukuras's Agreement.

-7-

Bukuras was responsible for overseeing the preparation of shareholder solicitation and disclosure documents related to these payments. In July 2005, Bukuras's legal department prepared spreadsheets which identified the anticipated severance compensation and "Transaction Payment[s]" for certain employees. The final spreadsheets, dated July 18, 2005, calculated Bukuras's anticipated severance payment as $1,027,500, using only his salary and, explicitly, his estimated FY 2005 "annual bonus." The spreadsheets did not include the transaction bonus in the severance calculation; instead, it was identified in a separate column in the spreadsheet. The figures in the spreadsheet were based on the assumption that the merger would close in FY 2006 and that the employees would be terminated in that year.

Charts based on these spreadsheets, and containing the same or materially similar disclosures, were reviewed and approved by Mueller's board and, on August 17, 2005, submitted to the Company's shareholders for approval. The shareholder disclosures indicated that the estimated severance payments were "calculated by reference to an estimated annual bonus payable for the 2005 fiscal year" (emphasis added). The shareholders approved the payments as outlined in the disclosures.

In early September 2005, the FTC notified Mueller of early termination of its approval process, which Mueller's outside counsel had previously opined would likely not occur until mid- to

late November 2005 (i.e., FY 2006).  The FTC approved the merger.

On September 26, 2005, Smith sent a letter to Bukuras stating, in

relevant part:

> [W]e are anticipating that the sale of Mueller Water Products to Walter Industries will occur on Monday, October 3.  . . .  I've been allowed the privilege of rewarding certain of our employees that have been involved in the sale process and whom have expended significant extra time and energy in bringing this transaction to a successful close.
> Therefore, upon the completion of the transaction on Monday, October 3, you will be receiving $1,000,000 as a one-time special bonus for your contribution to this transaction.

[hereinafter, the "September 2005 Letter"].  The merger closed as

expected on October 3, 2005 -- the first business day of FY 2006 --

and Bukuras was wired the $1 million transaction bonus.

In early November 2005, Bukuras was terminated without

cause.  In connection with his termination, and as an express

condition for receiving his severance payment, Bukuras signed a

broad, general release of all claims against the Company, including

claims arising from his severance of employment.

In December 2005, Bukuras received his annual,

EBITA-based bonus for FY 2005 in the amount of $468,600.  However,

Bukuras had agreed, for tax purposes, to defer receipt of his

severance compensation until six months after his termination.

Thus, it was not until May 2006 that Bukuras received his severance

payment of $1,040,700, which was based on 1.5 times his annual

salary and 1.5 times his FY 2005 annual bonus.  The $1 million transaction bonus he had received on October 3, 2005 was not factored into the calculation of his severance payment.

On May 18, 2006, Bukuras sent a letter to Smith calling attention to the Company's failure to include the termination bonus in the calculation of his severance payment and requesting a response, which he never received.

### B.  Procedural History

Bukuras filed a lawsuit in Massachusetts state court on September 20, 2006, which Mueller removed to federal court.  In his first amended federal complaint, filed in February 2007, Bukuras asserted several causes of action, including breach of contract, fraud, unjust enrichment, deceit, and negligent misrepresentation. Six of the claims were based, at least in part, on the Company's alleged failure to provide Bukuras with stock options commensurate with those awarded to other senior executives.  Another claim, for breach of the Agreement, was based on Mueller's failure to include the transaction bonus in the calculation of his severance payment. Mueller responded by filing a counterclaim alleging that Bukuras had breached the general release when he filed suit, and moved to dismiss Bukuras's complaint in its entirety.  The district court granted the motion to dismiss all of Bukuras's claims but the claim for breach of contract based on Mueller's calculation of his severance compensation.

The parties subsequently filed cross-motions for summary judgment on both the claim and counterclaim, and on August 14, 2008 the district court issued its decision. See generally Bukuras, 2008 U.S. Dist. LEXIS 64517. First, the court granted Mueller's motion, and denied Bukuras's motion, on Bukuras's contract claim, concluding that the contract was unambiguous and that "the bonus" described in the Agreement's Severance Provision referred exclusively to the Company's annual, EBITA-based bonus and did not include the transaction bonus. Second, the court granted Bukuras's motion, and denied the Company's motion, on Mueller's counterclaim, holding that the release did not include within its scope Bukuras's cause of action based on improper calculation of the severance payment, which was unliquidated at the time he signed the release. In addition, it held that the release was an affirmative defense to Bukuras's claims, but did not give rise to an agreement not to sue capable of supporting Mueller's claim for damages. Both parties now appeal.

## II. Legal Framework

### A. Standard of Review

We review a district court's grant of summary judgment de novo, Insituform Techs., Inc. v. Am. Home Assurance Co., 566 F.3d 274, 276 (1st Cir. 2009), and "the presence of cross-motions for summary judgment does not alter or dilute this standard." Kunelius v. Town of Stow, 588 F.3d 1, 8 (1st Cir. 2009). "We will affirm

-11-

entry of summary judgment if the record -- viewed in the light most favorable to the nonmoving party, including all reasonable inferences drawn in favor of the nonmoving party -- discloses no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law."  Id. at 8-9.  "We may affirm summary judgment on any ground manifest in the record."  Emhart Indus. Inc. v. Century Indem. Co., 559 F.3d 57, 65 (1st Cir. 2009).

### B.  Contract Interpretation

Under the terms of the Agreement, we look to Massachusetts contract law.  The interpretation of an unambiguous contract is a question of law for the court, as is the initial determination of whether an ambiguity exists.  Basis Tech. Corp. v. Amazon.com, Inc., 878 N.E.2d 952, 958-59 (Mass. App. Ct. 2008).  "Provisions are not ambiguous simply because the parties have developed different interpretations of them.  Genuine ambiguity requires language susceptible of more than one meaning so that reasonably intelligent persons would differ as to which meaning is the proper one."  Id. at 959 (quotation marks and alterations omitted); see Teragram Corp. v. Marketwatch.com, Inc., 444 F.3d 1, 9 (1st Cir. 2006) (applying Massachusetts law, and explaining that "[e]ven if a contract might arguably appear ambiguous from its words alone, the decision remains with the judge if the alternative reading is inherently unreasonable when placed in context").

"[A]n agreement is to be 'construed so as to give it effect as a rational business instrument and in a manner which will effectuate the intent of the parties[;]' the parties' intent 'must be gathered from a fair construction of the contract as a whole and not by special emphasis upon any one part.'" Kingstown Corp. v. Black Cat Cranberry Corp., 839 N.E.2d 333, 336 (Mass. App. Ct. 2005) (internal citations omitted). "[W]ords that are plain and free from ambiguity must be construed in their usual and ordinary sense," and the agreement should be read "in a reasonable and practical way, consistent with its language, background, and purpose." Cady v. Marcella, 729 N.E.2d 1125, 1129-30 (Mass. App. Ct. 2000) (internal quotation marks omitted).

"Common sense is as much a part of contract interpretation as is the dictionary or the arsenal of cannons." Fishman v. LaSalle Nat'l Bank, 247 F.3d 300, 302 (1st Cir. 2001). "In short, words matter; but the words are to be read as elements in a practical working document and not as a crossword puzzle." Fleet Nat'l Bank v. H&D Entm't, 96 F.3d 532, 538 (1st Cir. 1996)(applying Massachusetts law).

### III. Discussion

#### A. Alleged Breach of the Severance Provision

The Agreement's Severance Provision obligated Mueller to pay Bukuras upon termination "one hundred fifty (150%) percent of the bonus paid or payable to the Employee for the fiscal year

-13-

immediately preceding the fiscal year in which termination occurs." This dispute centers on the meaning of "the bonus" as used in this provision.

Bukuras contends that "the bonus" captures both his FY 2005 annual bonus and the transaction bonus he received in connection with the successful merger with Walter in FY 2006. He takes two steps to reach this conclusion. First, he contends that the transaction bonus was "paid or payable" for FY 2005 because, according to Smith's September 2005 Letter, the transaction bonus was paid "for his contribution" to the successful merger with Walter, and all his work towards that end occurred in FY 2005. Second, Bukuras argues that, in contrast to the "annual bonus" described in the Bonus Provision, the parties left the term "bonus" in the Severance Provision undefined and therefore to its plain and ordinary meaning, which he asserts comprehends both his FY 2005 annual bonus and any additional funds over and above his salary which were "paid or payable" to him for that year. Therefore, he insists, Mueller breached its obligations under the Severance Provision when it failed to include 150% of the transaction bonus in his severance payment.

Mueller counters, and the district court found, that the transaction bonus was properly excluded from the calculation of Bukuras's severance payment because (1) the transaction bonus was not "paid or payable" for FY 2005 due to the undisputed fact that

payment of the bonus was contingent on the closing of the merger, which did not occur until FY 2006; and, in any event, (2) the Agreement, read as a whole, makes clear that the drafters intended "the bonus" referenced in the Severance Provision to refer, exclusively, to the "annual bonus" described in the Bonus Provision.

We agree with the district court that Mueller was not required under the terms of the Agreement to include Bukuras's $1 million transaction bonus in the calculation of his severance payment. As Bukuras has acknowledged, the transaction bonus was paid, and became payable, in FY 2006 when the merger occurred. Nonetheless, Bukuras contends that <u>when</u> the bonus was paid or became payable is immaterial for purposes of determining <u>what</u> the bonus was paid "for." Rather, he asserts that the plain language of the Severance Provision requires us to ask what the transaction bonus was "in consideration or payment of." <u>See</u> Random House Dictionary of the English Language (2d. ed. 1987) (defining "for")(quoted in Appellant's Br. 17 n.12).[3] Relying on Smith's September 2005 Letter, he maintains that the transaction bonus was <u>for</u> "his significant extra time and energy in bringing [the] transaction to a successful close" and <u>for</u> "his contribution" to

[3] The Oxford English Dictionary notes, however, that "[o]f time" is also among the numerous definitions of the preposition "for." Oxford English Dictionary Online, <u>available at</u> http://dictionary.oed.com.

the merger. There is no dispute that his efforts with respect to the merger wrapped up in the final hours of the last business day of FY 2005.

Nonetheless, we reject the contention that the transaction bonus can reasonably be understood as "for" anything but the closing of the merger transaction in FY 2006. Indeed, the September 2005 Letter on which Bukuras relies specifically describes the transaction bonus as a "one-time special bonus" which would be paid, and would become payable, "[u]pon completion of the transaction" in FY 2006. Had the deal collapsed prior to closing, regardless of Bukuras's FY 2005 efforts or contribution, the bonus would never have been "paid" or become "payable." We thus conclude that because the closing occurred in the same year in which Bukuras was terminated, the transaction bonus was not "paid or payable . . . for the fiscal year immediately preceding" his termination and was, therefore, outside the scope of the Severance Provision.

In any event, we also agree with the district court that a comprehensive reading of the Agreement confirms that the parties intended "the bonus" in the Severance Provision to mean Bukuras's "annual bonus." In plain English, Bukuras's bonus "for" the fiscal year immediately preceding his termination is most comfortably understood as his FY 2005 "annual bonus." Mueller persuasively explains that the phrase "the bonus paid or payable . . . for . . . the fiscal year" was included to reflect the reality that annual

-16-

bonuses were paid following the conclusion of the fiscal year in order to allow its auditors time to crunch the Company's annual earnings figures.

This understanding of the term "bonus" as "annual bonus" is confirmed by the context in which the word was used; namely, an employment agreement containing an express Bonus Provision obligating the Company to pay an "annual bonus, payable at the conclusion of each fiscal year." It also lines up with common sense. Mueller's historical practice of paying Bukuras an "annual bonus" based on annual earnings reinforces the conclusion that, when the parties referenced "the bonus" for "the fiscal year," they had in mind the only bonus which Bukuras had received, and under the terms of his employment had an expectation to receive, at the time the Agreement was drafted.[4] As the district court noted, the Severance Provision references "the bonus" in the singular, and the reasonable inference is that by doing so the parties intended to

---

[4] Though Bukuras asserts that Smith held out the prospect of additional, discretionary compensation in addition to his annual bonus, there is no indication in the record that Bukuras received any other "bonuses" prior to -- or, for that matter, after -- the Agreement's execution, other than the transaction bonus. The record does reflect that the Company was not contractually obligated to pay out one hundred percent of funds available in the "annual bonus" pool described in the Bonus Provision, and that Smith had discretion as to how to dispense the remainder, and to whom. But even if Bukuras could have received an "annual bonus" greater than the share Mueller was contractually obligated to pay him, a fact which accounts for the "at least equivalent to" language used in the Bonus Provision, Bukuras had no reasonable expectation of receiving this additional, discretionary compensation at the time he negotiated the Agreement.

refer back to, and incorporate, the only other bonus -- Bukuras's "annual bonus" -- described within the four corners of the Agreement. Against this backdrop, Bukuras's contention that "the bonus" is a collective noun capable of comprehending the payment of multiple bonuses is a stretch too far.

Finally, as Section 4(c) of the Agreement makes clear, when the agreement was signed Bukuras had expressly agreed to waive any right to "Transaction Benefits" associated with the then-contemplated sale of the Company in exchange for the severance benefits described in Section 4(d). This provision demonstrates that, at the time of drafting, the parties did not understand the term "bonus" to include "Transaction Benefits." Even if the specific transaction referenced in Section 4(c) never materialized, Bukuras fails to explain why the parties would have understood special compensation associated with the FY 2006 transaction any differently.[5]

---

[5]  While Bukuras asserts that his different treatment with respect to Transaction Benefits supports the notion that he bargained away those benefits in exchange for an expansive definition of "bonus" in the Severance Provision, there is no support for this proposition in the text of the Agreement or elsewhere in the record. Rather, the explicit language of Section 4(c) and the circumstances of the parties at the time of drafting indicate that Bukuras agreed to forgo Transaction Benefits in exchange for comfort regarding his entitlement to severance benefits in the event of his possible termination following the contemplated FY 2003 sale. It makes little sense that Bukuras would have bargained away the Transaction Benefits in exchange for an expansive definition of bonus capable of comprehending a separate payment that he had no expectation of receiving.

Bukuras disputes this construction, emphasizing that unlike the term "Salary," which is defined in Section 4(a) and expressly incorporated in the Severance Provision, the Agreement does not create "bonus" as a defined term. He thus asserts that the term "bonus" as used in the Severance Provision was intentionally left to its plain, ordinary, and expansive meaning of "something given or paid over and above what is due." Random House Dictionary of the English Language (2d ed. 1987) (quoted in Appellant's Br. 14), and not the more limited description of "Bonus" as "annual bonus" set forth in the Bonus Provision. However, "the scope of a party's obligations cannot 'be delineated by isolating words and interpreting them as though they stood alone.'" Starr v. Fordham, 648 N.E.2d 1261, 1269 (Mass. 1995) (quoting Comm'r of Corp. & Taxation v. Chilton Club, 61 N.E.2d 335 (Mass. 1945)). As discussed, Bukuras's proposed construction strains the language of the contract, fails to account for the circumstances in which the Agreement was drafted, and is belied by a common sense reading of the document as a whole. The Agreement's failure to explicitly define "bonus" to the same extent as "Salary" fails to override these considerations. Cf. Wyner v. North Am. Specialty Ins. Co., 78 F.3d 752, 756-57 (1st Cir. 1996) (applying Massachusetts contract law, and concluding that the inconsistent capitalization and usage of terms in an insurance contract failed

to create an ambiguity where the contract's meaning could be reasonably discerned from other provisions).

Finally, Bukuras makes much of the fact that the Bonus Provision only required payment of an annual bonus "equivalent to not less" than the specified share of the annual bonus pool, and did not tie the Company to any particular method for determining bonus levels. He argues, among other things, that because payment of the $1 million transaction bonus alone would have satisfied the Company's obligations pursuant to the Bonus Provision, the transaction bonus must fall within the ambit of "bonus" for purposes of the Severance Provision; otherwise, he maintains, the Company could satisfy its annual bonus obligations while leaving Bukuras with no "bonus" factor for purposes of his severance payment. Plainly, this is a false syllogism. While, in Bukuras's hypothetical, payment of the $1 million he received as the transaction bonus would have been "at least equivalent to" his annual bonus share and therefore satisfied Mueller's obligations under the Bonus Provision, it does not follow that the transaction payment should therefore be understood as his "annual bonus." There is no dispute that Mueller paid Bukuras a substantial "annual bonus" for FY 2005 and included that annual bonus in the calculation of his severance payment.

Accordingly, we agree with the district court, for essentially the same reasons, that the Company did not breach the

terms of the Agreement when it failed to include Bukuras's transaction bonus in the calculation of his severance payment. We thus affirm the grant of summary judgment in favor of Mueller, and against Bukuras, on his claim for breach of the Agreement.[6]

### B. Alleged Breach of the General Release

On cross-appeal, Mueller contends that the district court erred when it held that the Company could not recover its fees and costs associated with defending against Bukuras's claims as damages for Bukuras's alleged violation of the release he signed. Bukuras answers that his claim for breach of the Agreement was outside the scope of the release and that, in any event, under the so-called American Rule, Mueller is not entitled to recoup its litigation expenses as damages for breach. Bukuras also maintains that all of his claims were permitted under a carve-out provision in the release, which states that "nothing herein is intended or shall be construed or understood to diminish or limit in any way any of the protections and/or benefits to which I may be entitled." The district court's determination that the release is enforceable as a knowing and voluntary waiver of rights is not at issue in this appeal.

---

[6] Because we conclude that the Agreement is clear on its face, we do not consider the August 2005 shareholder disclosures, or Bukuras's understanding of his severance rights as reflected in those documents.

The release executed by Bukuras was a broad one.  In it, Bukuras "voluntarily, irrevocably, and unconditionally release[d] and forever discharge[d]" the Company "from any and all complaints, claims, demands, or liabilities, or rights, whether known or unknown and whether in law or equity" which have or may "arise in whole or in part from [his] employment and/or termination from the Company."  The release goes on to "specifically include[]" a number of contract claims relating to his "employment or severance of employment."  The release provided Bukuras with a right to seek clarification of its terms, and stated that upon execution the Company would "assume, and ask any court or trier of fact to assume, that you have understood everything on which clarification has not been sought."  Bukuras sought no clarification regarding the amount of his severance prior to his execution of the release on November 1, 2005.

Nonetheless, the district court held that Bukuras's claim regarding the calculation of his severance payment was outside the scope of the release because "the precise amount of the severance payment had not been liquidated at the time the release was executed." Under the circumstances, we agree with this conclusion. Bukuras's claim for breach of the Severance Provision alleged that the Company failed to pay him the full benefits he was promised in consideration for signing the release.  As the district court noted, Mueller's proposed interpretation would permit the Company

to violate the terms of his employment contract by paying him less severance than he was due. An interpretation of the release that would deprive Bukuras of any recourse in the event of a violation of an unliquidated obligation on the part of the Company is simply untenable. We therefore conclude that the release did not prevent Bukuras from mounting a good faith challenge to the Company's interpretation of its obligations under the Severance Provision.

We also agree that the Company's attempt to bring an independent claim for breach of the release in order to recoup the costs of defending itself in this litigation must fail. A release is an affirmative defense; it does not supply a defendant with an independent claim for breach of contract. See Melanson v. Browning-Ferris Indus., 281 F.3d 272, 276 (1st Cir. 2002) ("Waiver and releases are affirmative defenses on which the employer bears the burden.") (applying Massachusetts law); cf. Isbell v. Allstate Ins. Co., 418 F.3d 788, 797 (7th Cir. 2005) (explaining that a release "does not result in breach upon the filing of a suit. Instead, it provides [a defendant] with an effective affirmative defense should a claim be raised").

Moreover, under the American Rule, which is followed in Massachusetts, attorneys fees and costs are generally not recoverable by a prevailing litigant in the absence of an explicit contractual provision or other applicable rule or statute. See generally Police Comm'r of Boston v. Gows, 705 N.E.2d 1126, 1128

(Mass. 1999); <u>Waldman</u> v. <u>American Honda Motor Co.</u>, 597 N.E.2d 404, 406 (Mass. 1992). Though there is no Massachusetts case squarely on point, the vast majority of jurisdictions adhering to this Rule do not permit a litigant pursuing claims for breach of a release to recover attorneys' fees and costs as damages in the absence of a contractual clause, rule or statute specifically providing for that remedy. <u>See</u>, <u>e.g.</u>, <u>Allison</u> v. <u>Bank One - Denver</u>, 289 F.3d 1223, 1244-45 (10th Cir. 2002) (applying Colorado law to conclude that "attorney fees and costs should not be awarded for breach of a release unless the agreement expressly provides that remedy") (internal quotation marks and alterations omitted); <u>Gruver</u> v. <u>Midas Int'l Corp.</u>, 925 F.2d 280, 284 (9th Cir. 1991) (explaining "the majority view that under the American rule, attorney's fees are not awardable where there has been a breach of a release and covenant not to sue unless attorney's fees were provided for in that release"); <u>see also</u> <u>W.R. Grace & Co. - Conn.</u> v. <u>Goodyear Tire & Rubber Co.</u>, No. 1:99-cv-305, 1999 U.S. Dist. LEXIS 22553, at *8-10 (W.D. Mich. Nov. 30, 1999) (noting that "the great majority of courts that have applied state law in resolving" whether attorneys fees and costs are recoverable for violation of a release and covenant not to sue "have held that litigation expenses are not recoverable," and surveying cases from various jurisdictions). We conclude that Massachusetts courts would also take this view. <u>Cf.</u>

<u>Gows</u>, 705 N.E.2d at 1129 (stating policy that "[a]n award of attorney's fees should be reserved for rare and egregious cases").[7]

In this case, the release Bukuras signed contained no fee-shifting provision that would have entitled Mueller to recover its costs or fees in the event of a breach. There is also no claim that Bukuras brought his lawsuit in bad faith, <u>see</u> Fed. R. Civ. P. 11, or otherwise engaged in litigation conduct which might support a claim for fees and expenses, <u>see</u>, <u>e.g.</u>, Fed. R. Civ. P. 37(c). Thus, in the absence of an express contractual provision or other source of authority which would permit the recovery of the relief Mueller seeks, we conclude that the Company is not entitled to recover its fees and costs as damages for Bukuras's alleged breach of the release. Accordingly, we affirm the district court's grant

---

[7] Mueller contends that we should read the release as a covenant not to sue, asserting that Massachusetts no longer recognizes any distinction between the two. The authority Mueller cites for this proposition, Mass. Gen. Law ch. 231B, § 4(a), is inapposite because it applies only to contributions among joint tortfeasors. In any event, we find that this distinction will not help Mueller under the circumstances because, as the cases cited above demonstrate, the prevailing view is that, as with a release, attorneys' fees are not recoverable for breach of a covenant not to sue in the absence of express contractual language providing otherwise. <u>Accord</u> <u>In re Weinschneider</u>, 395 F.3d 401, 404 (7th Cir. 2005) (explaining that under Illinois law, which follows the American Rule, "[a]ttorney fees and the ordinary expenses and burden of litigation are not allowable to the successful party" to recover for breach of a covenant not to sue "in the absence of an agreement or stipulation specifically authorizing the allowance of attorney fees, or in the absence of a statute providing for the taxing of attorney fees against the losing party").

of summary judgment against Mueller, and in favor of Bukuras, on its counterclaim.

**Affirmed**.