# United States Court of Appeals
## For the First Circuit

No. 13-1128

VFC PARTNERS 26, LLC,

Plaintiff, Appellee,

v.

CADLEROCKS CENTENNIAL DRIVE, LLC and DANIEL CADLE,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Howard, Stahl, and Thompson,
Circuit Judges.

David H. Rich, with whom Benjamin J. Wish and Todd & Weld, LLP
were on brief, for appellants.
Armando E. Batastini, with whom Nixon Peabody LLP was on
brief, for appellee.

November 12, 2013

**STAHL, Circuit Judge**. This lawsuit concerns a dispute between a borrower (along with its guarantor) and a lender over various expenses associated with a foreclosure on a parcel of real estate following a loan default. After a bench trial, the district court entered judgment in favor of the lender. For the following reasons, we reverse in part.

## I.  Facts & Background

Defendant Cadlerocks Centennial Drive, LLC ("Cadlerocks") is a Massachusetts limited liability company whose single asset is a mixed-use commercial and industrial property located at One Centennial Drive, Peabody, Massachusetts ("Property"). A warehouse located on the Property, built in 1964, was occupied during the time period relevant to this lawsuit by a daycare center and other tenants. Defendant Daniel Cadle ("Cadle") is President of The Cadle Company, which is the sole manager of Cadlerocks.

### A.     The Original Loan and Cadlerocks's Default

In December 1999, Cadlerocks entered into a loan with lender Salomon Brothers Realty Corporation ("Original Lender") in the principal amount of $1,925,000 ("Loan"). A Promissory Note ("Note") with an effective date of December 14, 1999, memorialized the Loan. The Note was secured by a Mortgage, Assignment of Rents, and Security Agreement ("Mortgage") on the Property, along with a separate Assignment of Leases and Rents, Exceptions to Non-Recourse Guaranty ("Guaranty") and an Environmental Indemnity Agreement

("Indemnity Agreement" or "Agreement"). Cadle executed the Guaranty in his personal capacity, and both Cadlerocks and Cadle executed the Indemnity Agreement.

The Original Lender conducted a Phase I Environmental Site Assessment ("1999 Phase I") prior to the closing of the Loan, which revealed the possible presence of tetrachloroethylene, also known as perchloroethylene ("PCE"), on the Property. PCE is a known carcinogen that is listed as a hazardous substance in the Massachusetts Contingency Plan, 310 Mass. Code Regs. 40.1600 (2012). The likely source was New England Carbide, a tenant prior to Cadle's acquisition of the Property, who used a degreasing agent containing PCE. Instead of following the Phase I test with a more comprehensive Phase II test, Cadlerocks decided to obtain an environmental insurance policy naming the Original Lender as the insured. At trial, Cadle was unable to produce an executed, authenticated copy of that policy.

On August 21, 2000, the Original Lender assigned the Mortgage and all related loan documents and agreements to Wells Fargo Bank as Trustee for the registered holders ("Trust"). ORIX Capital Markets, LLC ("ORIX") was the special servicer of the Trust

and acted pursuant to a Limited Power of Attorney.[1]  ORIX began servicing the Loan in December 2009.

The balloon balance due on the Note at its maturity date of January 1, 2010, was $1,464,935.  Cadlerocks failed to make that payment, defaulting on the Note, although it continued making payments on the interest and principal until August 2010.  During that period, the parties discussed the possibility of a loan modification.  After these discussions proved unsuccessful, the Trust decided to commence foreclosure proceedings.

### B.    Environmental Testing on the Property

Cadle offered a "deed-in-lieu," meaning a transfer of title without recourse, in settlement of the Trust's claims prior to foreclosure.  As part of ORIX's routine due diligence during these negotiations, ORIX engaged EBI Consulting ("EBI") to conduct a new Phase I test ("2010 Phase I"), which, like the 1999 Phase I, revealed the possible presence of PCE on the Property.[2]  Because of

---

[1] This Court granted ORIX and VFC Partners 26, LLC's Motion to Substitute on July 24, 2013, substituting VFC for ORIX as Plaintiff-Appellee as a result of an assignment of the Loan and Judgment that are the subject of this appeal.  For convenience, however, we will continue to refer to ORIX as appellee throughout the opinion, because ORIX was the loan servicer during the relevant time period.

[2]  A Phase I test is a visual inspection of the Property and review of the Property's history, including records of prior environmental tests or government action related to environmental hazards.  The 2010 Phase I test did not definitively reveal the presence of PCE on the Property, only the possibility of its presence based on the past usage of New England Carbide.

the results of the test, ORIX rejected the offer of the deed-in-lieu, postponed the foreclosure sale, and sought the appointment of a receiver. Cadlerocks did not oppose the appointment motion, and on December 15, 2010, the district court appointed Francis Morrissey ("Receiver") to serve as receiver for the Property.

Meanwhile, ORIX ordered EBI to conduct a Phase II test of the Property, consisting of an integrity test of an underground storage tank on the Property and a soil vapor investigation of the exterior of the warehouse. The tank passed the integrity test, but the soil vapor investigation identified the presence of PCE in the soil outside of the building. As a result, EBI recommended a test of the indoor air quality of the warehouse.

On March 20, 2011, Mark Germano, the Licensed Site Professional ("LSP") overseeing EBI's testing, conducted a "grab" test[3] that detected PCE in concentrations of 1.65 micrograms per cubic meter ($\mu g/m^3$) in the portion of the building occupied by the daycare center. On March 23, 2011, ORIX notified the Receiver of these results. The Receiver immediately authorized EBI to perform a second air quality test and retained its own independent environmental professionals, LSP James Young and attorneys McGregor & Associates. Young advised the Receiver that the result of the

---

[3] A "grab" test detects whether hazardous substances are present in the air, but does not determine the rate of exposure over a period of time.

March 20 grab test, even if accurate, did not represent an imminent health or safety risk.

Thereafter, on March 25, 2011, EBI conducted a second air quality test, which revealed PCE in concentrations of 1.16 $\mu g/m^3$. The following day, the Receiver provided the daycare center with Young's assessment of these results, which explained that "the concentration[s] measured are two to five orders of magnitude below available short-term guidelines and do not represent an acute (short-term) risk. To evaluate the risk of chronic (long-term) risk, a more thorough investigation is required."

In April 2011, Young walked through the building in an effort to "better assess the possible origin of the PCE vapors." He also conducted follow-up air tests to determine whether the levels of PCE were hazardous over an extended period of time. He collected eight-hour samples on June 24, 2011, and twenty-four-hour samples on July 9, 2011, but none of the tests showed concentrations of PCE at hazardous levels.

The Receiver sought reimbursement from Cadlerocks for the expenses he incurred related to the 2011 environmental tests. Cadlerocks did not respond, and the Receiver therefore requested payment from ORIX. ORIX agreed that the Receiver could draw down on income and sales proceeds generated from the Property that otherwise would have been applied to pay down Cadlerocks's debt.

There was no further testing until the fall of 2012, when a prospective buyer insisted on more recent data than the previous test results provided. At the Receiver's request, ORIX paid EBI to conduct a new round of tests. These 2012 tests included groundwater testing, soil borings, and indoor air testing. No testimony indicates that these tests revealed a hazardous level of PCE.

## C. Litigation

On November 22, 2010, ORIX filed this lawsuit against Cadlerocks and Cadle, alleging breaches of the various agreements related to the Loan. The district court partially granted ORIX's motion for summary judgment on October 18, 2012, holding that Cadle was personally liable for $33,438 in misappropriated rent. The court held a three-day bench trial on the remaining claims on December 18–20, 2012. At the conclusion of the trial, the court entered an order awarding ORIX $1,520 in damages related to the condition of the property and $102,536 for expenses related to the environmental testing on the Property under the Indemnity Agreement. In a separate order, the court awarded ORIX $50,000 in attorney's fees and $5,609.75 in costs. Appellants appeal the award of expenses related to the environmental testing, and ask this court to remand the award of attorney's fees and costs for reconsideration.

## II.  Analysis

The Indemnity Agreement provides in relevant part that Cadle and Cadlerocks would indemnify the Original Lender and its assignees and successors ("Indemnitees") "from and against all . . . costs, . . . demands, . . . expenses" and other liabilities "of any kind or nature whatsoever . . . sought from or asserted against Indemnitees in connection with, in whole or in part, directly or indirectly, . . . the presence, suspected presence, release, suspected release, or threat of release of any Hazardous Material" on or around the Property.[4]  It further specifies that "[s]uch Liabilities shall include" seven particular categories of liability, only one of which is arguably applicable here: "the cost required to take necessary precautions to protect against the release of any Hazardous Materials in, on, or under the Property, the air, any ground water, waterway or body of water, any public domain or any surrounding areas to the Property."

The district court held that ORIX was entitled to recover the majority of the costs associated with the environmental testing under the Indemnity Agreement.  ORIX Capital Mkts., LLC v. Cadlerocks Centennial Drive, LLC, 922 F. Supp. 2d 130, 137 (D. Mass. 2013).  The court did not award ORIX the costs of the 2010

---

[4] The Agreement also covers liabilities arising "in connection with . . . the breach of any representation, covenant or agreement of either of the Indemnitors contained in this Agreement."  ORIX has not claimed any such breach, however.

Phase I, which ORIX conducted as part of its routine due diligence. "Because ORIX would have conducted a Phase I regardless of any previous knowledge of the presence of PCE at the Property, that testing was not conducted in response to suspected environmental hazards and thus is not covered" by the Indemnity Agreement. Id. But it held Appellants liable for the remainder of the environmental testing costs[5] because the testing conducted after the 2010 Phase I "was reasonable and necessary, particularly given the Receiver's need to ensure that conditions were safe for the occupants of the day care facility on the premises." Id.

Appellants argue that all of the costs for environmental testing fall outside of the scope of the plain terms of the Indemnity Agreement, while Appellee urges this Court to affirm the district court's broad reading of the Agreement. Neither party argues that the Agreement is ambiguous, or attempts to introduce extrinsic evidence regarding its interpretation. Thus, the issue before us is whether the district court correctly determined the scope of the Indemnity Agreement. "Contract interpretation, when based on contractual language without resort to extrinsic evidence, is a question of law that is reviewed de novo." OfficeMax, Inc. v. Levesque, 658 F.3d 94, 97 (1st Cir. 2011) (internal quotation marks omitted).

---

[5] These costs included both the testing itself and the fees and expenses of the environmental consultant and attorneys.

Under Massachusetts law, we interpret contracts "in a manner which will effectuate the intent of the parties." Bukuras v. Mueller Grp., LLC, 592 F.3d 255, 262 (1st Cir. 2010) (quoting Kingstown Corp. v. Black Cat Cranberry Corp., 839 N.E.2d 333, 336 (Mass. App. Ct. 2005)). "[T]he parties' intent must be gathered from a fair construction of the contract as a whole and not by a special emphasis on any one part." Id. (internal quotation marks omitted). "'Words that are plain and free from ambiguity must be construed in their usual and ordinary sense,' and the agreement should be read 'in a reasonable and practical way, consistent with its language, background, and purpose.'" Id. (quoting Cady v. Marcella, 729 N.E.2d 1125, 1129–30 (Mass. App. Ct. 2000)).

In its findings of fact, the district court held that Cadlerocks agreed to "indemnify the lender for all costs and damages related to any 'suspected' or actual presence of 'Hazardous Materials' at the Property." ORIX, 922 F. Supp. at 132. The court's decision to deny ORIX relief for the 2010 Phase I, but award it the costs for all subsequent testing, shows that the district court interpreted the Indemnity Agreement as covering all "reasonable and necessary" expenses "conducted in response to suspected environmental hazards." Id. at 137. We believe this interpretation of the Agreement is too broad.

The district court's interpretation of the Indemnity Agreement is erroneous in two respects. First, it overlooks the

-10-

term of the Agreement limiting coverage to those liabilities "sought from or asserted against" the Indemnitees. Second, it ignores the sentence that limits coverage to certain specified categories of liability.

### A. Coverage Limited to Claims by Third Parties

By its plain terms, the Agreement only covers liabilities "sought from or asserted against" the Indemnitees. Grammatically, this phrase requires the existence of a third party imposing some type of liability on the Indemnitees; ORIX cannot seek costs from or assert claims against itself. Therefore, any costs that ORIX incurred on its own behalf, for its own purposes, do not fall within the scope of the Indemnity Agreement.

ORIX argues that "the Receiver plainly made demand upon ORIX for all the costs and expenses related to the environmental testing." This statement is only partially true. The Receiver did not begin to seek any costs from ORIX or incur his own expenses related to environmental testing until after he received the results of EBI's tests on March 23, 2011. Prior to that date, ORIX ordered the tests from EBI and paid for them itself. These were costs that ORIX incurred on its own; there was no third party seeking or asserting any liabilities against it. Thus, they do not fall within the scope of the Indemnity Agreement. The district court therefore erred in awarding ORIX the costs associated with

-11-

the Phase II test and the subsequent grab test conducted by Mark Germano on March 20, 2011.

### B.    Coverage Limited to Specified Liabilities

The next question is whether the second sentence of paragraph four (beginning "Such Liabilities shall include . . .") functions as a limitation on the much broader preceding sentence, or rather provides non-exclusive examples of certain types of liabilities covered.  The district court's approach to this question is unclear.  On one hand, it specifically found that the Receiver's tests were "reasonable and necessary."  The first sentence of paragraph four does not require that the covered expenses be necessary or reasonable.  The word "necessary" only appears in subclause (iv) of the second sentence, which extends coverage to "the cost required to take necessary precautions to protect against the release of any Hazardous Materials" in or around the Property.  Thus, the district court appears to interpret the second sentence as limiting the first, at least to some extent.

But while the district court appears to have read the second sentence as requiring the tests to be necessary, it did not address whether the tests were necessary for the purpose specified in subclause (iv): as a precaution against the release of hazardous materials.  On appeal, ORIX argues that the second sentence "does not limit the scope of indemnification, but rather expands liability by defining certain specific instances wherein rights to

-12-

indemnification attach."  Further, ORIX argues that even if the second sentence does apply as a limitation, the tests conducted in this case were necessary because of the undisputed presence of PCE on the Property.  Appellants argue that the tests were not necessary, because "there was never a recognized immediate threat to public health at the Property."  They also ask us to define the word "necessary" as it is used in the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-75.

Neither party's arguments are persuasive.  The parties' contract makes no mention of CERCLA as the defining touchstone for the Agreement, and nothing in the Agreement provides that the testing must be in response to an immediate public threat.  But the Agreement is not as broad as ORIX attempts to define it.

We begin by holding that the second sentence limits the terms of the first.  It is a well-established principle that "a subsequent specification impliedly limits the meaning of a preceding generalization." G. T. Schjeldahl Co., Packaging Mach. Div. v. Local Lodge 1680 of Dist. Lodge No. 64 of Int'l Ass'n of Machinists, 393 F.2d 502, 504 (1st Cir. 1968); see also McDowell v. von Thaden, 2006 Mass. App. Div. 148 (Dist. Ct. 2006) ("Specific and exact contractual terms are accorded greater weight than general language."); 11 Williston on Contracts § 32:10 (4th ed.) ("Even absent a true conflict [between the general and specific

-13-

provisions of a contract], specific words will limit the meaning of general words" when the specific words are consistent with the purpose of the agreement as a whole).  This principle is applicable here.

Unless the second sentence operates as a limit, the first sentence would expose Appellants to liability even for environmental testing that was completely unreasonable or unnecessary.  The Receiver in this case acted responsibly, but had he ordered tests arbitrarily, without any reasonable basis, Appellants would still be liable for those costs under ORIX's reading of the Agreement, as long as the tests were at least indirectly related to the suspected presence of a hazardous material.  Nothing in the first sentence prevents such a result.  But we do not think that Cadlerocks and the Original Lender intended this result when they negotiated the Agreement.  "Common sense is as much a part of contract interpretation as is the dictionary or the arsenal of cannons [sic]."  <u>Bukuras</u>, 592 F.3d at 262 (internal quotation marks omitted).  It makes more sense to read the second sentence as imposing reasonable limitations on the first.

We also note that the second sentence does not include the typical language parties often use to introduce a list of non-exclusive examples, such as "shall include but not be limited to," or "without limiting the foregoing, [the term] shall include."

See, e.g., In re Complaint of Martin, 596 F. Supp. 2d 142, 153 (D. Mass. 2009); Signet Elec. Sys., Inc. v. Taylor, No. Civ. 03-280-P-C, 2003 WL 22948035, at *1 n.1 (D. Me. Dec. 9, 2003) (unpublished). Although such language is of course not obligatory, its absence does weigh against reading the second sentence as a list of non-exclusive examples.

We must determine, therefore, whether the Receiver's expenses fall within the enumerated categories of liability listed in the second sentence. As we pointed out above, the only one that is arguably applicable is subclause (iv). Appellants are only liable for the Receiver's expenses related to environmental testing if those expenses were "required to take necessary precautions to protect against the release of any Hazardous Materials."

The test results that ORIX gave to the Receiver on March 23, 2011, did not indicate the possibility of a release of hazardous materials into the atmosphere (or anywhere else). Instead, the testing indicated a detectible presence of PCE already in the air, but at a level unlikely to pose a health threat to the building's occupants. And in fact, the amount of PCE detected declined slightly in the second grab test that EBI conducted on March 25, 2011. No one testified that they understood any of the test results as showing that a hazardous level of PCE was likely to be released into the air. There was never a point at which ORIX or the Receiver took steps to prevent such a release. Therefore, we

cannot conclude that the tests conducted by the Receiver were "necessary precautions to protect against the release of any Hazardous Materials."

Instead, the testimony and exhibits all indicate that the purpose of the Receiver's additional testing was to confirm that the known presence of PCE in the air was at a safe level, in order to ensure the building was safe for the daycare center and to facilitate the foreclosure sale. The propriety of the tests for that purpose is not actually in question. It was undoubtedly necessary for ORIX and the Receiver to ensure that the Property was free from harmful contaminants before selling it. The question is how the Indemnity Agreement allocates the cost of those tests. Cadlerocks agreed to indemnify "necessary precautions to protect against the release of any Hazardous Materials." The Agreement does not extend to tests conducted for the purpose of confirming the safety of tenants or attracting buyers in a foreclosure sale, however necessary those tests may be. Accordingly, those cost fall on ORIX.

In sum, the cost of the tests that ORIX conducted prior to March 23, 2011, falls outside of the scope of the Indemnity Agreement because they were not liabilities "sought from or asserted against" ORIX by a third party. The Receiver's expenses related to environmental testing fall outside of the scope of the Agreement because they were not costs "required to take necessary

-16-

precautions to protect against the release of any Hazardous Materials." Accordingly, we reverse the district court's order awarding ORIX the costs associated with environmental testing.

### III. Conclusion

For the foregoing reasons, we reverse the part of the district court's order awarding costs associated with environmental testing. We award the costs of the appeal to Appellants. We remand the district court's order awarding costs and attorneys' fees to ORIX for reconsideration in light of our decision.