# United States Court of Appeals
## For the First Circuit

No. 22-1200

ROBERT B. MINTURN,

Plaintiff, Appellee,

v.

BRUCE H. MONRAD, individually and as special personal
representative of the estate of Ernest E. Monrad, PETER J.
BLAMPIED, GEORGE P. BEAL, and CHARLES R. DAUGHERTY,

Defendants, Appellants,

NORTHEAST INVESTORS TRUST,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Barron, Chief Judge,
Selya and Lynch, Circuit Judges.

Shikha Garg, with whom Alison C. Barnes, Kramer Levin Robbins
Russell, E. Page Wilkins, David Lurie, and Lurie Friedman LLP were
on brief, for appellants.
Douglas W. Salvesen, with whom Richard J. Yurko and Yurko
Partners, P.C. were on brief, for appellee.

March 30, 2023

**SELYA**, **Circuit Judge**. This is an old-fashioned contract dispute. It requires us to construe contractual provisions under which plaintiff-appellee Robert B. Minturn claims entitlement to certain retirement compensation allegedly due to him from Northeast Investors Trust (the Trust), where he served as a trustee. Concluding, as we do, that the plain language of the controlling agreement entitles the plaintiff to the claimed compensation, we affirm the district court's grant of partial summary judgment and its subsequent entry of judgment in the plaintiff's favor for the sum of $794,500.

## I

We briefly rehearse the relevant facts (which are largely undisputed) and then chronicle the travel of the case. The Trust is a Massachusetts business trust organized in 1950. It operates as a mutual fund, the assets of which are managed by a board of trustees (the Trustees) for the benefit of passive investors, known as shareholders. From 1978 until his retirement in 2013, the plaintiff served the Trust in various capacities, including as clerk, chief legal officer, and vice president. He also served as a member of the board of trustees from 1980 until 2005.

In 1989, the Trustees executed an agreement (the Agreement) among themselves that outlined compensation and retirement compensation due to each trustee then in office. Under

- 3 -

the terms of the Agreement, the plaintiff (or his heirs, as the case may be) was entitled to quarterly payments amounting to $100,000 a year for ten years following his retirement, death, disability, or other incapacitating event. This annual rate would increase by $25,000 for each additional $100,000,000 in net assets held by the Trust at his retirement (beyond the total assets held by the Trust on March 31, 1989).

Under the Trust's Declaration of Trust, all trustee compensation must be paid out of a management fee, which is derived quarterly from the Trust's net assets at a fixed percentage. The management fee also pays for "all research and statistical services" and the Trust's office space.

The Agreement included two other relevant provisions. The first such provision, section 8, outlined a process for the independent (that is, non-management) trustees to reduce certain annual trustee retirement compensation by extending the total payment period in the event that specific circumstances — including the decline in value of trust assets by more than forty percent — transpired and the independent trustees deemed the reduction "advisable and in the best interests of the shareholders . . . in order to ensure the availability [of] adequate current compensation for the Trustees." The second such provision, section 11 — the meaning of which the parties dispute — read as follows:

Subject always to the best interests of the shareholders, it is contemplated and intended as between the Trustees of Northeast Investors Trust who are signatories hereto that this Agreement and the provisions hereof for the benefit of the individual Trustees, including provisions with regard to entitlement to payments of additional compensation, shall survive and continue and be made binding upon successor trustees, advisors, management companies, or any other individuals or entities becoming entitled to trustee, advisory and/or management fees from the Trust, however and in whatever form they are paid, despite any change of form or manner of management or operation of the Trust.

The Agreement was thrice amended (in 1994, 1998, and 2005), but none of these amendments directly affected the plaintiff's retirement compensation. In 2008, however, the Agreement was supplemented. This supplement (the Supplement) addressed federal tax-law changes and resulted in the characterization of the retirement compensation limned in the Agreement as deferred compensation that was deemed "earned and vested" as of December 31, 2004. The documents memorializing these revisions (that is, the three amendments and the Supplement) ratified the Agreement and were signed by all of the Trustees then in office — a group which, since at least 2005, included all of the defendants.

The plaintiff retired in 2013. At that time, the net assets of the Trust had increased by over $300,000,000, raising his retirement compensation to $175,000 per year. The Trustees

- 5 -

paid him equal quarterly payments totaling $175,000 annually through early 2018. In February of 2018, though, the Trustees did an about-face: they voted to reduce the plaintiff's retirement compensation to quarterly payments of $10,000, citing a sharp decline in the value of trust assets. The plaintiff received quarterly payments at this reduced rate until April of 2019. Then, the Trustees stopped paying the plaintiff's retirement compensation altogether.

The plaintiff did not go quietly into this bleak night. Instead, he sued the Trust and the Trustees then in office (Ernest E. Monrad, Bruce H. Monrad, Peter J. Blampied, George P. Beal, and Charles R. Daugherty)[1] in the United States District Court for the District of Massachusetts, alleging that the defendants improperly withheld his retirement compensation in violation of the Agreement. He also alleged, in the alternative, that the defendants were liable for wrongful denial of benefits and breach of fiduciary duty under the Employee Retirement Income Security Act (ERISA). See 29 U.S.C. § 1132(a)(1)(B), (a)(3), (g). The defendants answered, denying the material allegations of the

---

[1] During the pendency of the litigation, Ernest E. Monrad died. Bruce H. Monrad was then substituted in Ernest E. Monrad's place and stead, so that he is named as a defendant both individually and as special personal representative of Ernest E. Monrad's estate.

- 6 -

complaint and counterclaiming for a declaratory judgment. See 28 U.S.C. § 2201.

The defendants next moved to dismiss the plaintiff's complaint for lack of subject matter jurisdiction and failure to state a claim. See Fed. R. Civ. P. 12(b)(1), (6). The district court granted the motion to dismiss as to the plaintiff's claims against the Trust but denied it in all other respects. See Minturn v. Monrad, 2020 WL 6363909, at *4 (D. Mass. Oct. 29, 2020). Following the close of discovery, the plaintiff moved for partial summary judgment on his breach-of-contract claim. See Fed. R. Civ. P. 56(a). The district court granted the motion, holding that section 11 of the Agreement was "precatory, i.e., advisory," and that the phrase "[s]ubject always to the best interests of the shareholders" had "no bearing on the substantive obligations set forth" elsewhere in the Agreement. Minturn v. Monrad, 585 F. Supp. 3d 123, 127-28 (D. Mass. 2022).

With the consent of all the parties, the plaintiff's ERISA claims and the defendants' counterclaim were later dismissed. On March 1, 2022, judgment was entered for the plaintiff in the amount of $794,500 for quarterly payments due under the Agreement up through January 2022 (which amount included prejudgment interest). This timely appeal followed.

## II

We review a district court's grant of summary judgment de novo. See Pleasantdale Condos., LLC v. Wakefield, 37 F.4th 728, 732 (1st Cir. 2022). Summary judgment is appropriate when the moving party has shown that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a). In conducting this tamisage, we construe the facts in the light most favorable to the non-moving parties (here, the defendants) and draw all reasonable inferences therefrom to their behoof. See Pleasantdale Condos., 37 F.4th at 733. We are not tied to the district court's rationale but, rather, may affirm the judgment on any ground made manifest by the record. See Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999).

Here, the district court entered judgment for the plaintiff on a state-law claim. See Minturn, 585 F. Supp. 3d at 128. That claim was in federal court by reason of supplemental jurisdiction. See 28 U.S.C. § 1367(a). Thus, state law — in this instance Massachusetts law — supplies the substantive rules of decision. See Lawless v. Steward Health Care Sys., LLC, 894 F.3d 9, 21 (1st Cir. 2018); see also Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991) (confirming that federal court may accept parties' plausible agreement as to which state's law supplies the controlling rules of decision).

- 8 -

**A**

The singular question presented on appeal is whether the defendants breached the Agreement by reducing and then terminating the plaintiff's retirement compensation. In order to answer this question, we begin with first principles.

To demonstrate a breach of contract under Massachusetts law, "the plaintiff must prove that a valid, binding contract existed, the defendant breached the terms of the contract, and the plaintiff sustained damages as a result of the breach." Young v. Wells Fargo Bank, N.A., 828 F.3d 26, 32 (1st Cir. 2016) (quoting Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 232 (1st Cir. 2013)). Only the second of these three elements — whether the defendants' actions constituted a breach — is at issue in this appeal.

The interpretation of an unambiguous contractual provision presents a question of law for the court. See Gen. Hosp. Corp. v. Esoterix Genetic Lab'ys, LLC, 16 F.4th 304, 308 (1st Cir. 2021) (applying Massachusetts law). So, too, the determination of whether the provision is ambiguous is for the court. See Bukuras v. Mueller Grp., LLC, 592 F.3d 255, 261 (1st Cir. 2010) (applying Massachusetts law). A contract is ambiguous either where its "terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken." Farmers Ins. Exch. v.

RNK, Inc., 632 F.3d 777, 783 (1st Cir. 2011) (quoting Bank v. Int'l Bus. Machs. Corp., 145 F.3d 420, 424 (1st Cir. 1998)) (applying Massachusetts law).

If a court determines that the terms of the contract are unambiguous, it should resolve interpretive disputes based on the language of the contract, without resort to extrinsic evidence. See Esoterix, 16 F.4th at 308. In that process, the court must interpret the contract to effectuate the parties' discerned intent, which "must be gathered from a fair construction of the contract as a whole." VFC Partners 26, LLC v. Cadlerocks Centennial Drive, LLC, 735 F.3d 25, 29 (1st Cir. 2013) (quoting Bukuras, 592 F.3d at 262) (applying Massachusetts law). The contract should be interpreted "in a reasonable and practical way," reading words that are "plain and free from ambiguity" in their "usual and ordinary sense." Esoterix, 16 F.4th at 308 (quoting Bukuras, 592 F.3d at 262).

**1**

To determine whether the defendants breached the Agreement, we start with section 11 (reproduced in full above). The defendants claim that section 11 conferred upon them not only the power but also the fiduciary obligation to depart from the schedule of retirement compensation laid out in the Agreement and to modify that schedule whenever doing so was in "the best interests of the shareholders." The plaintiff demurs, responding

- 10 -

that section 11 is merely a precatory (that is, a non-binding) expression of the signatories' intention and, consequently, conferred neither any such power nor any such obligation. The parties offer dueling versions of syntactical rules that they suggest may be of assistance. To us, however, the result is clear: as we explain below, we read section 11, taken as a whole and construing its words in their usual and ordinary sense, as precatory. There is no ambiguity.

We turn first to the significance of "it is contemplated and intended." The parties spar over whether that phrase indicates that what follows — that is, that the Agreement and its provisions "shall survive and continue and be made binding upon" successor trustees — is precatory. The case law strongly favors the plaintiff's interpretation that "contemplated" and "intended," whether considered singly or in combination, do not signal a binding obligation. See, e.g., Advanced Water Techs., Inc. v. Amiad U.S.A., Inc., 457 F. Supp. 3d 313, 320 (S.D.N.Y. 2020) (collecting cases concluding that agreements "characterized by precatory language, such as 'It is the intention of [the parties],' . . . [are] unenforceable" (alterations in original) (quoting Dragon Head LLC v. Elkman, 987 N.Y.S.2d 60, 61 (N.Y. App. Div. 2014))); Sec. Bank & Tr. Co. v. Bogard, 494 N.E.2d 965, 969 (Ind. Ct. App. 1986) ("[T]he mere expression of an intention is not a promise."); Dauray v. Gaylord, 402 S.W.2d 948, 950-51 (Tex.

- 11 -

Civ. App. 1966) (concluding that "contemplate" is precatory); Hansen v. Catsman, 123 N.W.2d 265, 267 (Mich. 1963) (stating that "[o]rdinarily, the word 'contemplates' indicates an expectation or intention rather than a promise or undertaking"). Although there is a minority view, see, e.g., Denker v. Twentieth Century-Fox Film Corp., 210 N.Y.S.2d 241, 244 (N.Y. Sup. Ct. 1960) (explaining that "contemplate" may "connote a binding obligation"), we find that view unconvincing.

That said, we renounce any per se rule to the effect that the phrase "it is contemplated and intended" always renders what follows precatory. Just as no specific words are necessary to form a binding promise, see E.I. Du Pont De Nemours & Co. v. Claiborne-Reno Co., 64 F.2d 224, 227 (8th Cir. 1933), no specific words are necessary to form a precatory provision. The defendants concede that phraseology such as "it is contemplated and intended" might indicate, in some contexts, that a provision is precatory. They nonetheless assert that, when used here, those words are at least ambiguous.

Taken in a vacuum, the defendants' point may have some superficial appeal — but contract interpretation does not take place in a vacuum, and the absence of a per se rule does not get the defendants very far. They still must face up to the reality that phrasing such as "it is contemplated and intended" ordinarily implies that what follows expresses a non-binding intention (and,

thus, is precatory). And the mere fact that those words, standing alone, do not resolve the interpretive question as to whether section 11 is precatory does not render section 11 ambiguous. That fact only means that we must look to the surrounding text for further clarification. See Nat'l Tax Inst. v. Topnotch at Stowe Resort & Spa, 388 F.3d 15, 18 (1st Cir. 2004) (applying Massachusetts law) (finding that "related provisions may cast light on meaning" even when phrase considered alone is inconclusive).

**2**

Considering its text as a whole and reading its words in their usual and ordinary sense, it is clear to us that section 11 is precatory. That section goes on to express what is "contemplated and intended": that the Agreement, including the provisions for trustee retirement compensation, "shall survive and continue and be made binding upon" anyone who becomes "entitled to trustee, advisory and/or management fees from the Trust," notwithstanding "any change of form or manner of management or operation of the Trust." A prefatory clause qualifies that statement as "[s]ubject always to the best interest of the shareholders."

The plain and unambiguous meaning of section 11 is to express an intention for a future time during which the signatories (who were also the beneficiaries of the Agreement) are no longer

in charge of the management of the Trust. The signatories "contemplated and intended" that the Agreement would "survive" and "continue" should such changes occur while the provisions of the Agreement were still relevant. At such time, those provisions would "be made binding" — the passive voice implying that someone other than the signatories would be undertaking that effort — upon the persons who, in the future, would be charged with making management decisions for the Trust (but whom the Agreement did not yet bind). Effectuating that intention was, of course, conditioned upon the Agreement continuing to be in "the best interests of the shareholders." The signatories' aim, as reflected in the text, was to indicate to future management-fee recipients the signatories' intent that the Agreement remain in place even though they were no longer in a position to enforce it. There is simply no textual basis for concluding that the language was meant to provide a general override to every other section of the Agreement.

Contrary to the defendants' importunings, reading section 11 as precatory does not lead to the conclusion that it is meaningless. The signatories had no power to ensure that future management-fee recipients would be bound to the Agreement. See Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 129-30 (1st Cir. 2006) (applying Massachusetts law) (concluding that non-parties are not bound by agreement and, thus, cannot be held liable for breach). Nor did they have any power to ensure that the

Agreement would "survive and continue" after they were no longer trustees. Read against that background, section 11 expresses the signatories' intention that the terms of the Agreement should remain intact for future management-fee recipients. The bare fact that section 11 does not create a binding legal obligation does not render it meaningless. See Restatement (Second) of Contracts § 203 cmt. b (1981) ("The preference for an interpretation which gives meaning to every part of an agreement does not mean that every part is assumed to have legal consequences."); see also Byrne v. Perry, 421 N.E.2d 1248, 1249 (Mass. App. Ct. 1981).

The defendants' attempts to circumvent the plain meaning of the text are unpersuasive. They first suggest an interpretation of section 11 that would bypass "it is contemplated and intended" altogether, such that whether the Agreement "shall survive and continue and be made binding upon" future trustees is directly "[s]ubject always to the best interests of the shareholders." But this suggestion has an obvious flaw: it fails to account for the intervening words ("it is contemplated and intended"), which both basic grammatical rules and common sense instruct must qualify the three verbs that follow and convincingly imply that what follows is precatory. See Lieber v. President & Fellows of Harvard Coll., 179 N.E.3d 19, 26 n.15 (Mass. 2022) (explaining that "it is a fundamental principle of interpretation 'that every word and phrase of an instrument is if possible to be given meaning, and

- 15 -

none is to be rejected as surplusage if any other course is rationally possible'" (quoting Balles v. Babcock Power Inc., 70 N.E.3d 905, 914 n.17 (Mass. 2017))).

The defendants rejoin that "survive and continue and be made binding upon" is the "nearest reasonable referent" following the opening clause. But that rejoinder is struthious and ignores the language used by the signatories. Cf. Fishman v. LaSalle Nat'l Bank, 247 F.3d 300, 302-03 (1st Cir. 2001) (applying Massachusetts law) (warning that party's argument, though "strong on canons and doctrine," failed to provide rational interpretation of challenged text). The defendants would have us treat "it is contemplated and intended" as entirely redundant — but they offer no principled basis for us to do so. See DeWolfe v. Hingham Ctr., Ltd., 985 N.E.2d 1187, 1196 (Mass. 2013) ("[Plaintiff's] construction of the clause is to be favored, because the construction offered by the defendants fails to give effect to [specific] words.").

Next, the defendants assert that the district court incorrectly determined that "[s]ubject always to the best interests of the shareholders" applies only to "be made binding," thus failing to account for "survive" and "continue." They further assert that — when properly considered — "[t]he ordinary meaning of the words 'survive' and 'continue' confirms that Section 11 was intended to affect the conditions under which the Agreement would persist." One of those conditions, their thesis runs, is that the

- 16 -

Agreement would be "[s]ubject always to the best interests of the shareholders."

We accept the defendants' premise that the district court's opinion was imprecise in its discussion of the three verbs. See Minturn, 585 F. Supp. 3d at 127. We agree, moreover, that it would be folly not to account for "survive" and "continue" in construing section 11. See Jasty v. Wright Med. Tech., Inc., 528 F.3d 28, 36 (1st Cir. 2008) (applying Massachusetts law) ("[C]onstructions that render contract terms meaningless should be avoided." (alteration in original) (quoting Summit Packaging Sys., Inc. v. Kenyon & Kenyon, 273 F.3d 9, 12 (1st Cir. 2001))). The clause "[s]ubject always to the best interests of the shareholders" should apply to all three verbs — mediated (as discussed above) by "it is contemplated and intended."

Here, however, our review is de novo, see Pleasantdale Condos., 37 F.4th at 732, and accounting for all three verbs does not weaken the conclusion that section 11 is precatory. The defendants' contrary assertion only holds water if we adopt the unnatural and stilted reading that subjects the Agreement's survival and continuation directly to the best interests of the shareholders. The three verbs still have meaning if section 11 is precatory: section 11 relates the intention that the Agreement remain in effect should the "management or operation" of the Trust change. That includes the intention that the Agreement remain in

- 17 -

existence after the change (that is, that the Agreement "survive" the change); that it go uninterrupted (that is, that the Agreement "continue"); and that the Agreement "be made binding" on future management-fee recipients.

The defendants contest this common-sense construction. They claim that it blurs together the definitions of "survive" and "continue." This claim does not withstand scrutiny: although the definitions may overlap, they are distinct. And even though it is important to avoid interpretations of contractual language that render a word superfluous or redundant, see Starr v. Fordham, 648 N.E.2d 1261, 1270 (Mass. 1995), we are not so formalistic as to demand that each word in a contract must have a perfectly defined dominion that in no way impinges upon the dominion of another word.

To be sure, the words of a contractual provision matter. See Bukuras, 592 F.3d at 262. Even so, "the words are to be read as elements in a practical working document and not as a crossword puzzle." Id. (quoting Fleet Nat'l Bank v. H & D Ent., 96 F.3d 532, 538 (1st Cir.1996)). On such a reading, section 11 is plainly precatory.

**3**

The other sections of the Agreement reinforce the conclusion that section 11 is precatory and does not provide an avenue for overriding the specific obligations delineated in the Agreement. See Starr, 648 N.E.2d at 1269 (explaining that contract

obligations should be determined by looking both to immediate context and to all other contractual provisions).

**a**

The first interpretive clue is found in section 8, which provides a framework for modifying retirement compensation in the event of a decline in the Trust's net assets. Even though the defendants paid no heed to section 8 when reducing the plaintiff's retirement compensation, that section sheds a bright light on the meaning of section 11.

In contrast to section 11, section 8 is detailed: it explains under what conditions reductions in retirement compensation can be made and which persons are subject to such reductions; it pegs any such reductions to the total decline in assets and the pool of retirees receiving compensation; and it requires any reductions to be offset by a corresponding increase in years of payment (such that the total compensation remains the same). Section 8 also confers upon the independent trustees the power to determine whether trustee compensation should be reduced. That determination must be based on the independent trustees' assessment of whether a reduction "is advisable and in the best interests of the shareholders . . . in order to ensure the availability [of] adequate current compensation for the Trustees."

The defendants claim that section 11 allows them to abrogate or modify retirement compensation without any limitation

except that such an action is in "the best interests of the shareholders." That interpretation irreconcilably conflicts with section 8. Contracts must be read as a whole, and specific provisions customarily trump more general provisions. See Easthampton Congregational Church v. Church Mut. Ins. Co., 916 F.3d 86, 92 (1st Cir. 2019) (applying Massachusetts law). Section 8 is specific, whereas section 11 is general. It defies logic to think that contracting parties would include a detailed provision for when and how retirement compensation may be reduced and then include another provision allowing reductions essentially without limit. See Topnotch at Stowe Resort & Spa, 388 F.3d at 18-19. This is especially true inasmuch as the independent trustees' decision to trim compensation under section 8 is already made subject to "the best interests of the shareholders," with the result that the application of essentially the same clause in section 11 would be redundant.

As we have said, contracts should be interpreted "as rational business instrument[s]." Starr, 648 N.E.2d at 1270. The detailed process spelled out in section 8 convincingly demonstrates the signatories' understanding that modifications to trustee retirement compensation could become necessary if the circumstances of the Trust changed materially, but that any such changes should be cabined by stipulated guidelines and procedures.

This makes good sense: retirement compensation is something that recipients count on and would not want modified arbitrarily.

The defendants' attempts to resist this conclusion are futile. First, they argue that section 8 is "irrelevant" in this context because the stipulated conditions have not been met. They suggest that, until those conditions eventuate, section 11's "general" power governs modifications of the Agreement.

This threadbare suggestion will not wash. It would be unreasonable to interpret the Agreement as allowing modification (let alone complete abrogation) of specific obligations up to the time the stipulated conditions are met, without regard to any of the safeguards specified in section 8, and then abruptly subject such modifications to the specified safeguards once the conditions have been met. The only reasonable interpretation is that the Trustees had no power to modify the retirement compensation described in the Agreement unless the conditions in section 8 occurred, at which point the independent trustees could agree to reduce the compensation in accordance with the terms of that section.

The defendants try to erect one last buffer to shield them from the impact of section 8. They suggest that section 8 is irrelevant because it does not apply to the plaintiff's retirement compensation. This suggestion has a patina of plausibility: section 8 is not a model of clarity, and at one point, it seems to

indicate that only the annual compensation of two other trustees (Ernest Monrad and William Oates, Jr.) may be modified if the Trust's assets decline. At another point, though, section 8 explains that any compensation "so reduced" should still — over time — equal the total dollar amounts guaranteed to Monrad, Oates, and the plaintiff.

We need not resolve this ambiguity because it makes no difference here. See Brigade Leveraged Cap. Structures Fund Ltd. v. PIMCO Income Strategy Fund, 995 N.E.2d 64, 70 & n.11 (Mass. 2013). The relevance of section 8 to our analysis is that it furnishes compelling evidence that there is a specific provision in the Agreement that would be in conflict with section 11 if we were to interpret section 11 to allow the Trustees free reign to modify the Agreement. The two sections would be in conflict regardless (if not in application to the plaintiff, then in application to Monrad and Oates).

We add, moreover, that if section 8 does not apply to the plaintiff, the reasonable inference is that such an exclusion was deliberate. And it would follow that the Trustees cannot reduce the plaintiff's retirement compensation under any circumstances. See F.D.I.C. v. Singh, 977 F.2d 18, 22-23 (1st Cir. 1992) (explaining that "Massachusetts law embraces the maxim 'expressio unius est exclusio alterius,'" meaning that when "objects embraced by a contract" are enumerated, similar items not

included may be assumed to have been excluded intentionally (quoting Chatham Pharms., Inc. v. Angier Chem. Co., 196 N.E.2d 852, 854-55 (Mass. 1964))). That would be a rational choice: the plaintiff was expecting a significantly lower retirement-compensation package than Monrad and Oates. Accordingly, the drafters may not have been as concerned about the effects of a downturn in asset value with respect to paying the plaintiff's retirement compensation.

To sum up, section 8 falls short of crystalline clarity. Nevertheless, we can see no scenario in which its presence in the Agreement fails to support the conclusion that section 11 would conflict with it if section 11 were to be construed to give the Trustees the power to modify the retirement-compensation provisions in the Agreement. Cf. Blackie v. Maine, 75 F.3d 716, 722 (1st Cir. 1996) (holding that contractual provision, though "not a model of syntax," was nonetheless unambiguous when "[r]ead as a whole, the [provision] can sustain only one reasonable interpretation").

**b**

Yet another provision of the Agreement undercuts the proposition that section 11 gives the defendants unbridled discretion to reduce the plaintiff's retirement compensation. The Supplement, which was incorporated into the Agreement in 2008, characterizes the retirement compensation specified in the

- 23 -

Agreement (including the plaintiff's retirement compensation) as "earned and vested" as of December 31, 2004, such that it was "not subject to Internal Revenue Code Section 409A." In turn, section 409A (which was enacted in 2004) excluded certain deferred compensation from current taxation if the compensation had been deferred before January 1, 2005. See I.R.C. § 409A; 26 C.F.R. § 1.409A-6(a)(2) (2008). For compensation to qualify, the recipient must already have "had a legally binding right to be paid the amount, and the right to the amount [must have been] earned and vested." 26 C.F.R. § 1.409A-6(a)(2) (2008). If the payor "retained discretion to reduce the amount," the recipient was deemed not to have a legally binding right to that compensation. Id.

"[T]he law of Massachusetts demands that we harmonize [provisions within a contract] rather than strain to create an imaginary conflict." Singh, 977 F.2d at 24. Harmonizing section 11 with the Supplement requires us to reject the defendants' interpretation of section 11. After all, an interpretation of section 11 that grants the Trustees discretion to reduce the plaintiff's retirement compensation would conflict head-on with the Supplement's characterization of his compensation as "earned and vested."

**4**

In an effort to blunt the force of this reasoning, the defendants contend that section 11 generally — and the phrase "[s]ubject always to the best interests of the shareholders" specifically — should be read as formalizing the Trustees' fiduciary duties to the shareholders. Building on this foundation, they further contend that when the asset value of the Trust plummeted, the Trustees had a fiduciary duty under section 11 to revise the plaintiff's retirement compensation.

These contentions, in turn, rest on the defendants' notion that the Trustees must have understood that — in order to comply with their fiduciary duties — the specific obligations in the Agreement could only be binding within the limits of those duties. The text of section 11 must therefore be interpreted, the defendants submit, through the prism of that understanding.

The defendants' attempt to convert their fiduciary duties into an off-ramp that would allow them to detour around their contractual obligations does not put any points on the board. As we already have indicated, see supra Part II(A)(2), the text of section 11 unambiguously indicates that it is precatory. The defendants' "fiduciary duty" argument conveniently overlooks that text. And while the inclusion of the clause "[s]ubject always to the best interests of the shareholders" may indicate the Trustees' awareness of their fiduciary duties, that clause does nothing to

define specifically what the boundaries of those duties may be. Moreover, its applicability still extends only to the assessment of whether the Agreement, once it is no longer in force, should "survive and continue" on a going-forward basis (and, thus, "be made binding").

If more were needed — and we doubt that it is — the defendants have failed to articulate a comprehensible system as to how their fiduciary duties would pertain here (whether through section 11 or as an extra-contractual backstop). The defendants' "fiduciary duty" argument is not accompanied by any workable limiting principle: it would require the Trustees to subject every action that they take to the best interests of the shareholders, treating that clause as a continual condition precedent. The Trustees' ability to abrogate or modify any contract based on their fiduciary duties would be wholly unfettered: they could throw overboard any contract, including a contract with an unrelated third party, through the simple expedient of declaring that such a contract was no longer "in the best interests of the shareholders."

The defendants have not identified any pertinent authority sufficient to support so expansive a view of fiduciary duties. And that is no wonder: it is hard to imagine why anyone would enter into a contract with the Trust if such a free-wheeling regime was in place. Cf. Cofman v. Acton Corp., 958 F.2d 494, 497

(1st Cir. 1992) (applying Massachusetts law) (expressing "fundamental principle that a contract is to be construed as meaningful and not illusory"). Saddling third parties with losses simply to avoid imposing them on shareholders is not a rational result.[2] See Homeowner's Rehab, Inc. v. Related Corp. V SLP, L.P., 99 N.E.3d 744, 754 (Mass. 2018).

## III

We need go no further. Because we conclude that the Agreement is unambiguous as to the plaintiff's right to his agreed retirement compensation, we need not look to the extrinsic evidence proffered by the parties. Nor does section 11 of the Agreement undermine this conclusion. Taken together, the other provisions in the Agreement confirm what the text of section 11 already tells us: that section 11 is precatory. It cannot (and did not) relieve the defendants of the specific obligations provided in the Agreement, even in the event that they consider those obligations no longer to be in the best interests of the shareholders. Consequently, we affirm both the district court's grant of partial

---

[2] Laboring to avoid the weight of this analysis, the Trustees suggest that such an abrogation or modification would be acceptable only if the perceived conflict affected the Trust's viability. This suggestion, too, is unaccompanied by any persuasive authority. And we discern no justification for us to blaze a new trail through this uncharted terrain. Cf. Jones v. Secord, 684 F.3d 1, 10-11 (1st Cir. 2012) (warning that federal court applying state substantive law should be reluctant about getting out ahead of state courts and expanding state law).

summary judgment and its subsequent entry of judgment for the plaintiff.

**Affirmed**.