# United States Court of Appeals
## For the First Circuit

No. 22-1348

AJ MINI MARKET, INC.,

Plaintiff, Appellant,

v.

UNITED STATES,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

Before

Kayatta, Selya, and Montecalvo,
Circuit Judges.

George J. West on brief for appellant.
Zachary A. Cunha, United States Attorney, and Leslie J. Kane,
Assistant United States Attorney, on brief for appellee.

July 5, 2023

**SELYA**, **Circuit Judge**.    The supplemental nutrition assistance program (SNAP) — commonly known as the food-stamp program — is an important feature of the social net that assists underserved populations.    Like many social programs, SNAP's integrity (and, thus, its utility) depends on the commitment of the affected parties — the government, the benefit recipients, and the participating grocers — to play by the rules.

A failure to abide by the rules has consequences.    The Food and Nutrition Service (FNS) of the United States Department of Agriculture is tasked with overseeing grocers' participation in SNAP.    When FNS determines that a grocer has colored outside the lines and flouted programmatic guidelines, it is empowered to impose penalties (up to and including permanent program disqualification).

This is such a case.    After an investigation that in its judgment revealed evidence of unlawful trafficking in SNAP benefits, FNS disqualified plaintiff-appellant AJ Mini Market, Inc. (the Market) from further participation in SNAP.    The Market did not take this exile lightly:    it brought suit in the United States District Court for the District of Rhode Island, asking that the court overturn FNS's liability finding and vacate the program-disqualification order as arbitrary and capricious.    In a thoughtful rescript, the district court rejected the Market's importunings and entered summary judgment for the United States.

See AJ Mini Mkt., LLC v. United States, 597 F. Supp. 3d 537, 541 (D.R.I. 2022). The Market appeals. After careful consideration, we affirm.

**I**

We briefly rehearse the relevant facts and travel of the case. Because this appeal follows the district court's entry of summary judgment, we array those facts in the light most favorable to the nonmoving party (here, the Market). See Minturn v. Monrad, 64 F.4th 9, 14 (1st Cir. 2023).

The Market is a convenience store located in Woonsocket, Rhode Island. It sells some groceries, mainly inexpensive items, including canned and packaged foods, meats, snacks, and beverages (all of which are SNAP-eligible). It also sells a variety of other items, such as delicatessen foods (some of which are SNAP-eligible) and baby formula (which is SNAP-eligible). And, finally, the Market sells a salmagundi of items that are not SNAP-eligible, such as prepared foods, tobacco products, and lottery tickets.

The Market has been authorized to accept SNAP benefits since 1989. It has limited checkout counter space and ten shopping baskets but no shopping carts. And the Market has one cash register for food purchases, one point-of-sale device to process SNAP payments, and one optical scanner.

Prior to December of 2018, FNS's database flagged statistically unusual spending patterns at the Market — patterns

that could indicate SNAP trafficking. FNS proceeded to launch an investigation that included a store visit and a comparison between the shopping habits of the Market's customers and shoppers at other SNAP-eligible stores in the area. In the process, FNS reviewed transaction data from December of 2018 through May of 2019.

The investigation confirmed FNS's suspicions and — on July 11, 2019 — FNS sent a charge letter to the Market describing 384 SNAP violations based on the data, the store visit, and the shopping comparison. The charge letter grouped the violations into three categories, from which it drew an inference of SNAP trafficking: multiple transactions within a short period by the same household; depletion of a household's SNAP benefits within an abbreviated time frame; and a high volume of larger-than-expected transaction totals (based on store characteristics and food stock). The letter notified the Market that the sanction would be permanent disqualification from participation in SNAP. Last but not least, the letter informed the Market that it had an opportunity — in advance of a final determination — to produce evidence to refute both the liability finding and the proposed sanction. See 7 C.F.R. § 278.6(b)-(c).

The Market responded by providing 174 pages of receipts, claiming that these receipts clarified the nature of the allegedly offending transactions. Additionally, the Market suggested that its customers typically shop in bulk once or twice a month after

receiving their SNAP benefits, thus accounting for the spending patterns that FNS had deemed suspicious. The Market also requested that if FNS found a violation, it impose a monetary penalty in lieu of permanent disqualification. In its response, though, the Market did not identify any particular customers, nor did it furnish any materials describing SNAP compliance policies or training programs.

The Market's response did not move the needle. On August 15, 2019, FNS wrote to the Market, stating that the submitted receipts were not sufficient either to change the picture or to illustrate the legitimate use of SNAP benefits. Rejecting the Market's other arguments, FNS permanently disqualified it from further participation in SNAP.

The Market requested administrative review of both the liability finding and the sanction. It was given an opportunity to submit additional evidence to FNS's review officer, see id. § 279.3(b), but it made no further submissions. On June 12, 2020, the review officer upheld FNS's determination that the Market had violated SNAP regulations by engaging in trafficking. Relatedly, the review officer upheld the order for permanent disqualification.

Dissatisfied with the review officer's rulings, the Market commenced an action against the United States in the district court. Its complaint challenged both the liability

- 5 -

finding and the sanction.  See 7 U.S.C. § 2023(a)(13), (15).  After the close of discovery, the United States moved for summary judgment.  See Fed. R. Civ. P. 56(a).  Although the Market opposed the motion, the district court granted it.  See AJ Mini Mkt., 597 F. Supp. 3d at 541.  The court concluded that the Market had not shown the existence of any disputed issue of material fact sufficient to undercut the finding that it had trafficked in SNAP benefits.  See id. at 540.  Moreover, the court concluded that permanent disqualification was neither arbitrary nor capricious but, rather, was a fitting sanction under the applicable regulations.  See id. at 541 (citing 7 C.F.R. § 278.6(e)(1)).

This timely appeal followed.

## II

In this venue, the Market advances two claims of error. First, it argues that it should not be held liable for trafficking in SNAP benefits because the transactions upon which FNS relied were legitimate.  Second, it argues that — even if the liability finding withstands scrutiny — FNS should have reduced the penalty imposed to a monetary sanction.  We address these arguments sequentially.

## A

Our starting point is the Market's claim that it did not traffic in SNAP benefits.  We review the district court's entry of summary judgment de novo.  See Minturn, 64 F.4th at 13.  Our

appraisal, like that of the district court, gives no weight to the agency's finding that trafficking occurred. See Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 376, 379 (1st Cir. 2018); see also 7 U.S.C. § 2023(a)(15). Instead, we must consider afresh the entirety of the expanded record compiled before the district court. See Irobe, 890 F.3d at 377.

Summary judgment is appropriate when the movant can demonstrate both that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. See Minturn, 64 F.4th at 13-14; see also Fed. R. Civ. P. 56(a). In reviewing the summary judgment record, we must construe the facts in the light most favorable to the nonmovant and draw all reasonable inferences to its behoof. See Minturn, 64 F.4th at 14.

Shifting from the general to the specific, it is clear that a store that engages in SNAP trafficking violates the law. See 7 C.F.R. §§ 278.2(a), 271.2. Typically, such trafficking occurs when a store accepts SNAP benefits in exchange for cash or prohibited items. See id. § 278.2(a). For example, "a store traffics when it 'accept[s] food stamps for sales that never took place,' allowing its customers to receive 'cash rather than merchandise.'" Irobe, 890 F.3d at 375 (quoting Idias v. United States, 359 F.3d 695, 698-99 (4th Cir. 2004)).

In this instance, FNS proffered no direct evidence of unlawful transactions. But direct evidence of unlawful transactions is not necessary to prove trafficking: circumstantial evidence may suffice. See 7 U.S.C. § 2021(a)(2); 7 C.F.R. § 278.6(a); see also Irobe, 890 F.3d at 379. To this end, FNS often identifies potential trafficking through a system that tracks data from SNAP-authorized stores and flags spending patterns indicative of trafficking. See Irobe, 890 F.3d at 375. Such telltale patterns include the presence of transactions that are large when compared to the items offered for sale by the store, see Euclid Mkt. Inc. v. United States, 60 F.4th 423, 427 (8th Cir. 2023), the presence of transactions that are substantially greater in dollar amount than transactions at similar stores in the area, see Fells v. United States, 627 F.3d 1250, 1254 (7th Cir. 2010), and the presence of high-dollar-amount SNAP transactions recorded in rapid succession, see Idias, 359 F.3d at 698. When such patterns are present, they give rise to an inference of trafficking. See Irobe, 890 F.3d at 380.

Stores can refute the inference of trafficking by contesting the accuracy of the data or providing evidence to demonstrate the legitimacy of the transactions. See 7 C.F.R. § 278.6(b). When challenging a finding that it trafficked in SNAP benefits, "the store bears the burden of proving by a preponderance

- 8 -

of the evidence that its conduct was lawful." Irobe, 890 F.3d at 378.

In the case at hand, FNS charged the Market with 384 violations based on numerous suspicious transactions. Among those putative violations were 303 transactions that were at least 300 percent higher than monthly averages at comparable Rhode Island stores and more than twenty instances of a single household making purchases in rapid succession (sometimes completely depleting the household's SNAP benefits in the process). The Market has not challenged the accuracy of any of the data presented by FNS.

There was more. FNS examined the habits of six households receiving SNAP benefits and concluded that those households all shopped at larger and better-stocked grocery stores on the same days that they shopped at the Market. FNS noted that — at the time of the investigation — there were twenty-two other SNAP-eligible stores within a one-mile radius of the Market.

These statistical analyses gave rise to an inference of trafficking. See id. at 380. The burden shifted, then, to the Market to rebut that inference. See 7 C.F.R. § 287.6(b)(1).

In an effort to dispel the inference of trafficking and to prove the legitimacy of the suspect transactions, the Market submitted 174 pages of receipts (with many pages including more than one receipt). The receipts purport to be itemized, but many include the generic description "DELI" for most or all entries.

For example, many receipts include over $100 worth of transactions labeled "DELI." Several of these include single "DELI" items priced at over sixty dollars — which is more than the cost of any single item at the Market. Many other items shown on the receipts are listed as "MISC NON-TAXA(B)" with no further identifying information. The receipts indicate that the purchases were made using SNAP benefits, but they do not clarify which SNAP household made them.

Viewed in their totality, these receipts do not adequately refute the inference of trafficking. They lack any meaningful detail that would explain the unusually large SNAP-benefit transactions that FNS identified. Indeed, many of the receipts appear to confirm the oddities that troubled FNS. We explain briefly.

To begin, the receipts are more opaque than informative. Many of them include only or mostly a series of "DELI" purchases, without further elaboration. Only certain deli items were SNAP-eligible, and the receipts do not shed any light on which items were eligible to be purchased with SNAP benefits and which were not. What is more, many receipts include items labelled "MISC NON-TAXA(B)" with various prices, giving no explanation as to what that item was or whether it was SNAP-eligible.

Importantly, the receipts do not answer the questions that FNS raised. For instance, FNS noted that the dollar amounts

of many transactions at the Market were unusually high given the relatively inexpensive inventory of items that the Market offered, the fact that there were better-stocked and cheaper grocery stores nearby, and the apparent conflict between the large purchases and the Market's limited stock.

An example helps to put the point into perspective. Presumably in response to FNS's allegation of unusually expensive purchases, the Market provided numerous receipts showing high-value purchases of baby formula — including many purchases of over $100 worth of formula at a time. But the formula receipts raise more questions than they answer. First, most SNAP recipients also qualify for the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC), which covers baby formula. Second, the Market was authorized to accept WIC benefits during the relevant period, yet the receipts reflect exclusive use of SNAP benefits for formula purchases. Third, there was at least one larger WIC-authorized grocery store within a half-mile of the Market. Seen in this light, these receipts do not answer FNS's question about unusually expensive purchases but do raise a question as to why households would spend large amounts of SNAP benefits on formula at the Market.

Nor do the receipts explain the large serial transactions within single households over short time frames. They do not identify customers by SNAP household. And they provide no

explanation for how or why large transactions could be accomplished in rapid succession at a store selling mostly low-price goods and equipped only with one small checkout counter.

The Market argues that it is not unreasonable for individual SNAP accounts to have multiple transactions within short periods of time because shoppers forget items and because shopping patterns at a small store (such as one having shopping baskets but no carts) may make buying a plethora of goods at once unwieldy. That may be so, but the Market has provided no proof, beyond its own speculation, that such purchasing patterns were prevalent at its store. Guesswork and conjecture, without more, are not enough to blunt the force of curated data showing suspicious spending patterns. See Irobe, 890 F.3d at 381.

Taking a different tack, the Market argues that the inference of trafficking based on data is "pure surmise" because that data "was unaccompanied by any physical observance of a[] deviation from SNAP rules." But this is merely a recasting of the Market's argument, previously rejected, that circumstantial evidence alone cannot support a finding of a SNAP violation. FNS is not obliged to catch the Market red-handed in order to determine that it has engaged in SNAP-benefit trafficking. Instead, FNS may base its findings — as it has here — on circumstantial evidence as long as that evidence is "adequate to ground a strong inference of trafficking." Id. at 380; see 7 U.S.C. § 2021(a)(2); 7 C.F.R.

§ 278.6(a). FNS gathered ample data which, combined with its observations, was strongly suggestive of unlawful trafficking. The Market has wholly failed to rebut that compelling inference.

To be sure, the Market proffers a mélange of observations that it claims explain FNS's data. It contends, for instance, that the Market's customers shop in bulk once or twice a month and that the Market's previous history of compliance should be weighed in the balance. These contentions were not advanced before the district court and, thus, are deemed waived. See Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992).

We add, moreover, that even if not waived, these contentions would provide no lifeline for the Market. Notwithstanding its assertion that customers shop in bulk once or twice a month, the Market has offered no evidence to support that assertion.[1]

---

[1] The Market's attempt to draw an analogy to Skyson USA, LLC v. United States, 2010 WL 651032 (D. Haw. Feb. 22, 2010), invites us to compare plums with pomegranates. There, a bulk grocery store successfully rebutted trafficking charges based on evidence of unusually high household depletion of SNAP benefits at the start of the month. See id. at *11. The store supplied evidence showing that it restocked its inventory more frequently during the beginning of the month as well as detailed receipts showing that more of its inventory was SNAP-eligible than FNS had thought. See id. at *6, 11. Here, however, the Market has offered no comparable evidence — and it is a convenience store, not a bulk grocer.

- 13 -

By the same token, the Market's contention that FNS should have considered the Market's entire history of SNAP transactions as evidence that it did not engage in trafficking is unavailing. Even if we assume that the Market has a satisfactory record of past compliance — a matter on which we take no view[2] — such a record would be irrelevant to the issue of liability where, as here, FNS has supportably found compelling evidence of pervasive trafficking. See Idias, 359 F.3d at 697; see also 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i).

To sum up, FNS made out, through circumstantial evidence, a cognizable case of trafficking. In the face of that case, the Market has not proffered any evidence sufficient to carry its burden of proof. See Irobe, 890 F.3d at 381. Nonspecific receipts and conclusory observations comprise too flimsy a shield to deflect the swing of the summary judgment axe. See id. (explaining that "'a conglomeration of conclusory allegations, improbable inferences, and unsupported speculation is insufficient' to ward off summary judgment" (internal quotation marks omitted) (quoting DePoutot v. Raffaelly, 424 F.3d 112, 117 (1st Cir. 2005))). Consequently, we hold that the district court

---

[2] Even though the Market repeatedly argues that it "had no history of non-compliance prior to the instant complaint," the record indicates that the Market was previously subjected to a temporary six-month disqualification order.

did not err in entering summary judgment in favor of the United States on the liability issue.

**B**

This leaves the Market's challenge to the permanent program-disqualification sanction. The Market argues that program disqualification is too draconian a sanction and that a monetary penalty would be sufficient.

The choice of a sanction rests largely within FNS's discretion. See 7 C.F.R. § 278.6(a). We will only upset FNS's choice of a sanction if that choice is "arbitrary, capricious, or contrary to law." Irobe, 890 F.3d at 377 (quoting Mass. Dep't of Pub. Welfare v. Sec'y of Agric., 984 F.2d 514, 520 (1st Cir. 1993)). The party challenging a sanction bears the burden of showing that the sanction is inappropriate, that is, arbitrary or capricious. See 7 U.S.C. § 2023(a)(15); 7 C.F.R. § 279.7(c).

To qualify for a monetary penalty in lieu of permanent disqualification, a store must establish by substantial evidence that it satisfies four criteria: that it has "an effective compliance policy" as outlined in 7 C.F.R. § 278.6(i); that "its compliance policy and program were in operation at the location where the violation(s) occurred prior to the occurrence of violations"; that it has "an effective personnel training program" as described in 7 C.F.R. § 278.6(i); and that the store owner "was not aware of, did not approve, did not benefit from, or was not in

- 15 -

any way involved in the conduct or approval of trafficking violations," or that it was "only the first occasion" in which store management was involved. 7 C.F.R. § 278.6(a), (i).

As a general rule, a store has several opportunities to submit the evidence necessary to qualify for the reduced sanction of a monetary penalty. See id. §§ 278.6(b)(1), 279.3(b), 279.7(c) (providing stores with opportunities to submit new evidence after charge letter, after requesting administrative review, and after commencing lawsuit in district court). These opportunities were available to the Market, but the Market squandered them.

In response to the charge letter, the Market provided only receipts. It did not submit further documentation either to the FNS review officer or to the district court. So, too, it provided no evidence showing either a store-wide compliance policy or a training program for cashiers. And although the Market boasts that it has "an effective personnel training program," this boast is not backed by facts: the Market has not produced training materials, a list of dates on which training took place, a description of methods employed in checking for employees' understanding of store policies, or anything else that would suggest the existence of a viable training regime. Nor did the Market adduce any evidence to show either that it had installed anti-trafficking software or that its owner was unaware of and did not benefit from whatever trafficking may have occurred. In short,

the Market failed to provide evidence sufficient to show that it had satisfied any of the four criteria.

In an effort to fill this yawning void, the Market cites 7-Eleven #22360 v. United States, 560 F. Supp. 3d 892 (D. Md. 2021). There, the district court preliminarily enjoined FNS from enforcing a permanent disqualification sanction against a store during litigation challenging the agency's decision to permanently disqualify it. See id. at 896. The court found that the store was likely to succeed in showing that the permanent disqualification was arbitrary or capricious because, in part, "[t]he disqualification of the [s]tore upon its first offense in 16 years of business seems to be an 'unduly harsh' policy." Id. at 916 (quoting Ahmed v. United States, 47 F. Supp. 2d 389, 397 (W.D.N.Y. 1999)).

7-Eleven is readily distinguishable. In that case, the permanent disqualification was based on only two instances of SNAP trafficking by a "rogue employee." Id. at 896. Moreover, the store provided ample documentation in support of the four criteria enumerated above. See id. at 915-16. That is a far cry from this case, in which the violations were numerous and the Market failed to provide any compliance policies, training materials, or other evidence in support of the criteria.

The Market makes one last effort to undermine the sanction. It argues that significant harm to the community will

occur if it were disqualified from SNAP because low-income families will lose their local grocery store.  This argument will not wash.

For one thing, hardship to the community is not a factor to be considered in determining the appropriateness of a permanent SNAP program-disqualification order.[3]  See 7 C.F.R. § 278.6(i). For another thing, the claim of hardship rings hollow here:  the record indicates that there are at least twenty-two other SNAP-eligible grocery stores within a one-mile radius of the Market (some of which are better-stocked and cheaper).

That ends this aspect of the matter.  We hold, without serious question, that the sanction imposed (the permanent program-disqualification order) was neither arbitrary nor capricious.

## III

We need go no further.  For the reasons elucidated above, the judgment of the district court is

**Affirmed**.

---

[3] Hardship may be considered, though, with respect to the imposition of temporary disqualification orders.  See 7 C.F.R. § 278.6(a), (f)(1).